Good morning and welcome to the Ninth Circuit. We appreciate that the lawyers have been able to appear here in person even though the notice was short and I would like to recognize my two colleagues Judge O'Scanlan and Judge Watford who've flown in from Portland and Los Angeles respectfully this morning to be here for the argument. Innovation Law Lab v. McAleenan, when you're 15 minutes aside but given the nature of the case if we take you over don't be alarmed and we'll make sure both sides get to say what they need to say. Thank you Your Honor. May it please the court I'm Scott Stewart on behalf of the United States. If I may Judge Fletcher I'm going to try to aim to save three minutes for rebuttal. Okay. In this case the district court enjoined on a nationwide basis the migrant protection protocols an important executive branch initiative to address a significant immigration crisis facing the United States. The district court's injunction is flawed. This court should stay that injunction pending appeal so that it can address address those flaws in due course. I'll start with the district court did Your Honor's as with the statutory authority issue the question whether section 1225 of title 8 authorizes the migrant protection protocols. The parties do not do not dispute that under sections 1225 B2a and B2c if those were the only two operative provisions of section subsection B2 return to continuous territory of individual plaintiffs like those here would be authorized. That is to say if the plaintiffs here were those described in B2 that would be authorized. My understanding of the government's argument is that while there are two categories of applicants or arriving applicants B1 and B2 the government's argument is that there's a B1 category and then there's a B2 category that includes not only B2 but also B1. I would like to hear the government tell us what their argument is judge. Okay well that's the argument I read. Okay sure Your Honor correct that that is our argument our argument is that when border personnel encounter an arriving alien who lacks immigration documents and just does not have an entitlement to enter enter the country those folks potentially apply you know fall into either of two categories one is is is a category susceptible to expedited removal because they don't have documents they committed fraud they misrepresented entered without inspection whatever or a broader category there may be including including those folks or just a broader group of folks of other inadmissibility grounds. Counselor let me ask you with respect to the 11 that are here in this case how many were determined by immigration officers to be put in expedited removal under B1 or how many and how many were put in full removal proceedings under B2. Yes Your Honor the decision was made to put all 11 in proceedings under B2A full removal proceedings which then came with it the authority to return them under B2C. And what is behind that determination is there are the formal regulations that point in a certain direction in terms of how you exercise your discretion to go one way or the other? It's it's just a just an informed use of discretion Judge O'Scanlan it's the section B2C the contiguous return provision doesn't specify particular criteria so what the secretary did here was describe a category of aliens who were potentially amenable to to this MPP process. It carved out before you got to that category certain folks unaccompanied minors Mexican nationals and some others and then it said as to these folks who who who fit into this into this group individual line officers can exercise discretion and say hey is this person you know a candidate for return to we think it'll be fine and there's no specific the person the line officer must consider this fact or that fact. Just an exercise of discretion. So a line officer could identify a particular alien for B1 processing or make a decision with respect to that same alien to put that person into B2. It's up to the line officer the immigration officer? If the person is susceptible to either proceeding then then the person then yes it's an exercise of discretion Judge O'Scanlan. And what does the government rely on for its power to exercise discretion? It's it's the conceded well-recognized authority your honor this is this is something the district court recognized at pages 15 to 16 of its opinion that was recognized in in paragraph 73 of the plaintiff's complaint that's recognized in matter of ERM the board's decision that a well-rooted principle of law enforcement discretion is the decision of what kind of enforcement proceeding to put somebody into. Here officers can choose between two that could potentially apply. Here you have the B1 procedure and the B2A full removal procedure. So they these these are folks who in an exercise of discretion B2A was applied. One last question was there something that stood out about these 11 that were eventually removed to Mexico pending the full removal proceedings was something stood out about them that caused as a matter of policy the immigration officer to select B2 rather than B1? I don't think we know that your honor it is an exercise of line officer discretion. The point the point I'd emphasize here your honor and this is I think key to the statutory argument really is this B2B authority and how to emphasize is that the government has a very coherent and textual understanding of that that statute. My friends on the other side in the district court do not have that. Our B2B the idea is it carves out anyone from a return process to whom who could be put in expedited removal. That collapses with the district court's recognition and the plaintiff's concession and the long-standing principle that DHS has discretion and authority to put aliens who could be placed in expedited removal proceedings into full removal proceedings. You know you know if I can interrupt I'd like to go back to the question I began which is to say your premise your argument is entirely dependent upon your argument that B1 applicants are also in the category of B2 applicants. Here's my problem with that argument. B1 is headed inspections of alien or aliens arriving in the United States and certain other aliens who have not been admitted or paroled. B2 is headed other aliens which strongly suggests that these are two categories that are separate. Further the court in Jennings just last year describes these as two separate and non-overlapping categories. What authority do you have for your reading that they're not separate and non-overlapping categories? Your Honor I think I can clarify and hopefully hopefully I give some comfort there. Jennings didn't address this precise issue but I think the key point is that it's once somebody's put in a B2A proceeding they're not they're out of the B1 bucket. Once somebody's put in a B1 proceeding they're out of the B2A bucket. The question is I'm not asking about procedures I'm asking about categories and as I read B1 and B2 those are separate categories. B1 says inspection of aliens described so-and-so and B2 very clearly says other aliens. Others suggest that they're not the same. Once they've been put in the relevant proceedings, Your Honor, as all agree the DHS can put them into B2A proceedings or B1 proceedings. The only authority to put somebody in B2A proceedings that plaintiffs have cited that the district court has recognized is B2A. To be able for DHS to have the authority to place them in full removal proceedings at all, which all concede is available, you need B2A. So B2A needs to be read B2A, B2B they need to be read in a way to authorize. Can I just read to you from the Supreme Court's decision in Jennings from last year? I'm on page, well it's a Supreme Court rather than a U.S. site, on page 837. The court writes, applicants for admissions fall into one of two categories, B1, B2. Section 1225B1 applies to aliens initially determined to be inadmissible due to fraud, misrepresentation, or lack of documentation. B1 also applies to certain other aliens. B2 is broader. It serves as a catch-all provision that applies to all applicants not covered in B1, not covered in B1. That goes exactly against your position. Your Honor, that's from the background of the case on page 837 of the Supreme Court's opinion where it describes, you know, as a matter of background. Again, the issue was not presented in that case. It was not definitively decided. What I'm saying is that, yes, I can accept that people are, there are two different categories after somebody is placed in there. And an officer needs to determine that they meet the criteria and then place them in the relevant proceeding. So your position is that we don't know whether somebody is covered by B1 as opposed to B2 until an immigration officer makes a decision to initiate one form of proceedings or another? Is that your position? The way I'd phrase it, Your Honor, is that the question of which provision applies depends on the determination to put them into one category or another. And then once a decision, once a particular, once B1 applies, once B2a applies, then things flow from there. If it's B2a, the B2c authority falls in. So your view is that the folks covered by B1, let's just, you know, an arriving alien who is inadmissible on one of the two grounds specified there, so your view is that that's not like just some kind of an inherent objective characteristic that they possess. They only get covered by that once an immigration officer says, I'm going to place you in an expedited removal proceedings? Right. It's a matter that, it's not a mere descriptor. It's which provision, what decision is made to allow one or the other provision to apply to that person, Your Honor. What's the textual basis for that reading? Because, Your Honor, there's no dispute that an alien could be, could both fall in the B1 description or the B2 description. There's a good amount of overlap between the two. And again, all agree this goes to, even though both provisions have mandatory language, they need to be read in light of principles of prosecutorial discretion that we are conceded to have about what kind of proceeding to put somebody into. So the point I emphasize, though, Your Honor, is that since all agree, district court, plaintiffs, government, that we, the government, can put somebody into a full removal proceeding, it can't be the case that B2A ceases to apply to folks who could have B1 applied to them. Because B2A is the authority to apply that full removal proceeding to them. And once that's recognized, Your Honor, the district court's position falls apart, the plaintiff's position falls apart, and all have to concede that we, the government, under B2A, are putting people in full removal proceedings under B2A and can use contiguous return. Roberts. Okay. So just one other question on this point. So once an immigration officer decides to place someone in B1 versus B2 proceedings, let's assume here they're placed in B1 proceedings. Yes, Your Honor. At that point, it's like that's your classification forever. And even if you express a credible fear and are placed into regular removal proceedings, you still are a B1 person. You never can be converted into a B2 person. Is that your view? I'm not sure if it's never the case, Your Honor. What ends up happening is if you go through the B1 system, and you kind of pass everything, you're detained for an asylum proceeding. I'll leave open the possibility that there may be a return issue in that case. We haven't gotten there in that case. I don't want to foreclose that. It's not something the district court relied on, and particularly just in the stay posture here. I think the key thing is what the district court relied on, and we just don't have good authority here. But I would leave that open, Your Honor. If I could hit another point on the statutory authority argument, we emphasize this in our briefs, and then I want to make sure to save time for rebuttal. Well, I have some questions on the other issue, so save some time for that, too, please. Okay. Very good. Let me interject here. You're down to two minutes and a half, so the idea of saving time isn't going to work if we stick with 15 minutes. So relax, talk. Everybody gets to ask what they need to ask, and you get to say what you need to say. I appreciate that. Thank you, Judge Fletcher. The point I'll hit on the statutory authority argument very quickly, Judge Fletcher, is just — Well, no, it's — Or with respect to Judge Watford. Focus. I think a point of emphasis here is that the plaintiffs and the district court's understanding of the contiguous return authority just doesn't really make sense. I mean, the — this authority, it doesn't make sense to take the view that the people who are — only the people who are facially entitled to enter the country, people who have entry documents, didn't commit fraud, didn't enter between courts of entry without inspection, that those are the folks who have this return authority subject to them. But people who, for whatever reason, don't have documents, committed fraud, misrepresented, that those folks somehow are exempt for it. That's not really the way Congress legislates. It's not a good sense — it doesn't make good sense of the law. No. If I can interject here for a moment, and then you can get back to Judge Watford, I think you're feeding into the argument made in the papers you filed with us that B-1 applicants are more culpable than B-2 applicants. You said that in the reply brief. Is that — is that where you're heading with this? I think — I think something along those lines, Your Honor, or I'd say potentially entitled to fewer procedures and can be removed more swiftly, surely. No, but — no, but what I'm after is the argument that B-1 applicants, because they may have fraudulent documents or no documents, are more culpable than B-2 applicants. You made that argument in your brief. Are you sticking with that argument? I think we're — we are sticking with the version of the argument we made in the brief, Your Honor. What I — Well, no, what I'm asking you is very directly, are you saying that B-1 applicants are less worthy or more culpable than B-2 applicants? The way I would say it — I wouldn't completely adopt that phrasing of it, Your Honor, and I don't mean to be difficult about that. Well, your word in your brief was culpable. Right. I think as a category, as a — as a general — as a general matter, it was reasonable for Congress to take the view that they had less entitlement to be here and, you know, and they are subject to — The reason I'm going there, and it may be the reason why you're a little reluctant to answer yes or no, is that B-1 applicants are classic asylum applicants. They come to this country with fraudulent documents that allow them to travel, or they come to this country without documents. And we all understand that the ordinary asylum applicant, bona fide asylum applicant, some of them entitled and some of them not to asylum, that's how they come in. B-2 includes drug addicts, convicted criminals, terrorists, and alien smugglers. So are you going to stick with the notion that B-1 applicants are more culpable than B-2? What I'm going to stick with, Your Honor, and I take your point, but what I'm going to stick with is the B-1 applicants as a category, as a general first-cut judgment by Congress, are less likely to have an entitlement to enter and remain in the country. But asylum applicants fall in both categories, Your Honor. I mean, asylum isn't necessarily made with regard to, you know, all bad conduct. Many, many asylees have committed some form of illegality or something that you  Sure. Of course. So I'll agree that the asylum, non-asylum distinction doesn't really work because folks can and do pursue asylum in both sets of groups. What Congress could reasonably include, though, is that, look, these categories of folks who do not have — who facially don't have an entitlement to be here and who are subject to mandatory detention, they shouldn't, as a category, be better off than people who facially are entitled to be here for some reason. They presented, they have some kind of a document, they have some reason to be here. That's the point I'm getting at. Okay. I'm sorry for the distraction. You had a pending answer or question between you and Judge Watford. Yeah. No, no. I just wanted to shift if — unless you have statutory — No, I'm fine. I wanted to shift to the district court made an alternative determination here that even if the government has statutory authority to do this, the procedures by which it's implemented, the MPP, are themselves unlawful. And I wanted you to speak to that issue. And in particular, I guess I don't understand how the government is taking the view that you don't have to ask the person who is to be returned whether they have a fear of being returned to Mexico. I just don't see how that is not arbitrary and capricious. If your goal is to avoid running — I don't know how to pronounce that word. Is it refoulement? I think it's like scienter, Your Honor. Everyone has their own approach to it. How do you say it? I say non-refoulement. Okay. Refoulement. Okay. I'd give you a few answers on that, Judge Watford. There's no requirement in non-refoulement obligations to require the relevant country to affirmatively ask whether somebody asserts a fear. The system as a whole puts the burden on the applicant. I mean, expedited removal itself by statute, Your Honor, does say, look, the — No, no, no. Don't — I mean, the regulation is very clear that you must ask the person. So I don't — Fair, Your Honor. Fine. The statute doesn't speak to it, but you — the government has promulgated regulations, which I think I would say were really required. I don't know that you can get around having to ask the person. If you're going to try to comply with your obligation not to violate the — I don't know the terminology — the non-refoulement, why in the world wouldn't you ask the person? Well, Your Honor, when you're dealing with the expedited removal and just removal context in general, you're dealing with a very different situation. You're dealing with somebody who's saying, look, I fear return in my country of origin from which I fled. It's different in a contiguous territory return context, particularly under the MPP, Your Honor, where what you have are largely folks from Northern Triangle countries, not from Mexico, who transited Mexico and just came from there and are — can reasonably be understood to, fresh out of Mexico, say, like, look, I'm afraid of Mexico, or here's my fear, or here's my issue. But it's reasonable and completely rational for the Secretary and for the government to say, look, the return context is different in kind from a removal context. We're just returning somebody to the country that they're not from. You're right. It's different in that respect. But the obligation, the ultimate obligation imposed by, I guess, our treaty commitments, is exactly the same. But there's — but it is the same — the same kind of overarching obligation remains in place, Your Honor. The way I'd say it, though, is that the way that it applies or is implemented in a given context can differ. Trinidad v. Garcia, the Court's en banc decision, is a good example of that. It said, look, 1231b3 and its related procedures didn't apply in that case. It was an extradition case. And the en banc court said, look, you know, if the Secretary of State complies with the executive branch regulation, says she did, that's enough. If she just determines it's more likely than not that somebody won't be tortured, that's enough. I'm not — I'm just talking about not asking the person. Right? So you have an obligation not to return them to a place where they would face persecution. Right? That's — we've committed ourselves to doing that. And so — and I'm saying, how could you set up a rational system to comply with that when they wouldn't know to volunteer that? Your Honor, they'll have the opportunity at any of a number of times. And, again, these are individual plaintiffs who are claiming on the face of the complaint that they have a fear of Mexico. They have the opportunity to do that at various points. And, Your Honor, the numbers bear out, as reported to the government by DHS, that this process does work. People who — dozens of people have had their return — you know, have not been returned to Mexico, something like one in five who stated a fear. You know, a good portion, about one in 20, I believe it's 40-some out of a little over 200, have not been returned to Mexico after stating a fear and going through the process. This is a procedure that works. What does that have to do with the — I guess the thing that's bothering me, and I'm just faulting you for — it seems to me you're not responding to my concern. I'm sorry, Your Honor. I'll try that. The Secretary has said, I want to implement this policy, and I want to comply with our treaty obligations. Right? Yes, Your Honor. You would concede, I think, that a sizable number of the folks who are prospectively going to be returned to Mexico are not aware of the fact that if they express a fear of persecution in Mexico that they could be allowed to remain. I'm assuming you're not going to say that 100 percent of the people in that population know that they have this legal ability to remain, right? So how can you want to comply with your obligation if you're not at least going to ask the person, hey, by the way, before we send you to Mexico, do you have a fear of returning there? I just don't see that's such a minimal obligation to impose on the government. I don't see why that wouldn't be the only rational way you could comply with the obligation not to send them back. I think two responses to that, Your Honor. One, a direct response, I hope, and two, kind of a state posture response. The first one is that under the board's decision in MEVG, it's up to each contracting state how to implement the particular non-refoulement obligation here. It's perfectly rational to say, hey, if people are coming from, you know, if they're claiming a fear in a contiguous territory where they just left, where they're fresh out of that country, it's perfectly reasonable to have them present that fear and just say, look, this is my circumstance, I face this problem in Mexico or that kind of a thing. Perfectly rational. The second point I would emphasize, though, Your Honor, is that if this were the only flaw Your Honor were to find in the system, that would weigh in favor of staying the kind of broad invalidation and just saying, hey, agency, you can implement this, but just affirmatively ask people if they have fear. And that would solve the problem. So I would suggest that that would militate strongly in favor of some kind of very potent stay of the existing injunction. But I would stick with the point, Your Honor, that international treaties don't require any particular set of procedures. It's rational to take a different approach in the return context than the removal context. I understand the appeal of affirmatively asking about fear. But under MEBG and under at least Congress, at least it contemplated in the expedited removal statute, I take the point about the regulation, didn't think it was necessarily the case that somebody needed to be affirmatively asking fear. And I would also hit, Your Honor, that in the district court, my friend did acknowledge that you don't need the full panoply of 1231B. I know that's not a full response, but anyway. Are there further questions to the bench at this time? Why don't we hear from the other side and we will give you a chance to respond. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, my name is Judy Rabinowitz and I represent the plaintiffs. I'd like to follow up on first on the statutory and then move on to the question about the adequacy of the procedures. But in terms of the statutory, first of all, the government's assumption that somebody who is placed in — who is subject to B-1 and is placed in regular removal proceedings as an act of prosecutorial discretion is therefore under B-2 is an assumption. It's not. It's, in fact, contrary to what the Board found in matter of ERM, where it was — and that was the case where the Board said there is authority to take people who are subject to 235B-1 and put them — and exercise prosecutorial discretion and put them in regular removal proceedings, 240 removal proceedings, 1229A, whatever you want to call them. And it said that those individuals, though, were still individuals to whom the 235B-1 applied. There was the language in ERM that said the Respondents in this case, who were individuals who had been placed in regular removal proceedings, are still an alien to whom 235B-1 applies. Is that, though, because they were initially placed in expedited removal proceedings? No. They weren't initially placed in expedited removal, as far as I know. They were individuals who could have been placed in expedited removal because of the — you know, they fell under those grounds of inadmissibility, those two grounds of inadmissibility. At least that's the way I understood it. I understood that it was a decision just that we can decide whether to place these people into expedited removal proceedings or regular removal proceedings. And the case that we sent to the Court yesterday — I apologize for the late notice — just reaffirmed that. That's the Attorney General's decision in matter of MS, which says the same thing. It says that the government can place somebody either — they said they took the categories. They said the category is somebody who's inadmissible, either for fraud, misrepresentation, or lack of documents, can be placed either in expedited removal or regular removal proceedings. And then the authority they cited was 235B-1. They didn't cite 235B-2. So I think that that is a false notion to begin with, that just because somebody who falls under 235B-1 is placed into regular removal proceedings, they've moved into 235B-1. Well, counsel, one of the things that's troubling me is it seems to me you're asking your clients, the 11, none of whom were treated under B-1, to give up their present freedom in Mexico for mandatory detention if they're returned to the United States. Why would they want that? Well, it's a good question, Your Honor. And it was something that we asked all of them before we signed them up as plaintiffs because we said, look, you need to understand if we win this lawsuit, this doesn't mean that you're going to be released. It means that you're going to be — go back to the United States, and either you'll be put in expedited removal or regular removal, but you could be detained. And we asked them, and we said, what do you prefer? And they said, we don't want to be in Mexico. We'd rather be in the United States. Well, if that's the case, then they have to be treated under B-1 when they come back. Isn't that right? No, they don't. Well, again, the whole question of what it means to be treated under B-1, what I was just saying before, Judge O'Scanlan, is that somebody can be under B-1 and still be put into regular removal proceedings. It's like, you know, B-1 is the class of people who are inadmissible on certain grounds, the people who could be put in expedited removal or not. But I don't know that it matters. At this point, they've been put into regular removal proceedings. If they're brought back, the question is going to be whether they're detained or not. I think the critical question is the one that you asked about why would they want that. And why they would want it is because it's so dangerous in Mexico. Well, they came through Mexico, most of these people, during quite a long trip. And they were within Mexico for quite a few days. Why would it be more dangerous in Mexico than it is in their home country, whether it's Honduras or wherever? Well, it's dangerous in their home countries as well, Your Honor. That's what it's like. My question was, why would it be more dangerous in Mexico than it would be in their home country? It may not be more dangerous, but it's still very dangerous. And the question is, why would we be — this is the question that I'd like to move to, because I think it goes to Judge Fletcher's — your point about who we're talking about here and who Congress was thinking about. Well, I just want to be sure I understand your argument. You are asking us to consider that these 11 should be treated as B-1, because that's your argument from B-2-B, is it not? In other words, you're looking at the B-2 statute, which says it shouldn't — it doesn't apply to B-1 category. Right. Well, if it doesn't apply to B-1, that's what you're arguing here, is it not, that you want them to be in B-1? Right. And what I'm saying is they can be in B-1 and still be in regular removal proceedings. Well, your argument — I don't want to put too many words in your mouth. They are B-1. They've always been B-1. And because they're in B-1, they're entitled to what B-1 people get, which is to either expedited removal or 1229 regular removal. And they're in B-1, and that's what they get. Exactly, Your Honor. And the point — But the government says they're B-1 only because they're in B-2, and then the government chooses to treat them as B-1. How would you respond to that argument? I don't understand. I mean, I must say, I don't even think I understand the argument. Well, that's the government's argument. Right. Let me put the government's argument in a way I understand it. Okay. And then you can respond to that. I understand the government to be saying when somebody first encounters an immigration officer, and let's say that we know that they are potentially inadmissible on one of the two grounds specified in B-1, even if we know that, we still don't know what category they fall into until an immigration officer either decides to place them in expedited removal proceedings or under B-1 or in regular removal proceedings under B-2. And until that determination is made, a person doesn't fall into either category. Right? That's — it seems to me is their argument. And I guess I'd want to hear your response to why that's incorrect. Yeah. I think it's — I have a little trouble responding because my understanding is the inspection process, they inspect somebody, they determine that they're inadmissible on one of the grounds that would subject them to, you know, to 235B-1, to expedited removal, and then they decide whether to put them into expedited removal or to into regular removal. And none of that involves B-2. They're B-1. And that's why I'm — that's why I was pointing out to the — No. That's — yeah, that's how you look at it. But they look — they read the statute differently. And I just want to hear why you say that they're — from a textual standpoint, their — their reading is wrong. I don't. I don't know which category someone falls into unless and until an immigration officer makes a determination as to which form of proceedings to place them in. So why is that not the correct reading of the statute? Well, I guess it depends on whether — I mean, if we're looking at the language of 235B-2B-2, if that's the language that they're talking about, and the question is to whom 235B-1 applies, I guess maybe we're coming down to the question they're saying that to whom 235B-1 applies doesn't mean to whom the statute applies. It means to whom DHS has decided to apply it. Well, the word determines is in both B-1 and B-2. So it seems logical that the determination of the immigration officer is what sets the trajectory. Either you're going to be treated under B-1 or you're going to be treated under B-2, as determined by the immigration officer, in which case, since this is a B-2 determination, that B-1 applies can't apply because they weren't B-1. Well, Judge O'Scallion, I think it depends on what the determination is. I thought the determination of the officer is whether you're inadmissible on certain grounds. That's what the officer's determining. And if they determine that you're inadmissible on the grounds that fall under 235B-1, then you're 235B-1. That seems to be what Jennings is talking about, what the Supreme Court talked about in Jennings, that there are these two classes that reflect grounds of inadmissibility. And then how they decide to treat people who are inadmissible on those grounds is a matter of prosecutorial discretion, whether they put them into expedited removal or whether they put them into regular removal proceedings. And I don't understand how to reconcile the government's argument with the cases that I just cited, the matter of ERM and matter of MS, that both say they treat somebody who has been placed into regular removal proceedings as somebody who is a person who is to whom paragraph 1, 235B-1, applies. And it seems very clear that they're saying the authority to put somebody in regular removal proceedings doesn't have to come from 235B-2. It can come from 235B-1. It can come from 1229A, which is the statute that provides for regular removal proceedings. So there's no reason to be saying it's 235B-2. I would like to sort of point out, though, that there's another problem with the government's position, which is I'm a little bit confused by their presentation just now, because my understanding was that they had sort of switched positions and now we're taking the position that really 235B-2 has nothing to do, you know, 235B-2B-2 has nothing to do with who's subject to the contiguous territory provision because the contiguous territory provision, and I'm reluctant to set out their argument for them, but they can come back and correct me, but the contiguous territory provision applies to people described in subparagraph A. And they now say that people described in subparagraph A is any alien, any alien who is not clearly entitled to be admitted, and that the language in 235B-2, even though it says subject to paragraph B and subparagraph B says that paragraph A, you know, that there are three categories of people, three categories of noncitizens, including people subject to expedited removal, who aren't under A, that that's irrelevant. But the problem then is you're dealing with 2A, 2B-2, which says subparagraph A does not apply to an alien to whom paragraph 1 applies. Now, you are arguing that paragraph 1 does apply. So how can you have it both ways? In other words, if you're contending that they should have been treated under B-1 to begin with... I'm actually dealing with a different... Well, you tell us there are two categories, B-1 and B-2. And if you're telling us that they should be considered category B-1, well, then if that's the case, then when you apply the exception at B-2, that excludes paragraph A as well. What I'm saying, and maybe I'm not understanding your question, Judge Scanlon, but my understanding is that the government shifted its position entirely and has said we don't really care what 235B, 2B-2 says, because the contiguous territory provision applies to everybody. Essentially, it applies to everybody, that that language, 235B, 2B-2, has nothing to do with who's described in paragraph A, even though it does describe certain groups who aren't supposed to be in A. They're saying it's irrelevant to that. And so the consequence of that position, because I think it's important to understand, is that anybody who's in 240 removal proceedings, under their view, is subject to contiguous territory return, as long as they're also arriving at a land port. That means that somebody who has been placed in expedited removal, passes a credible fear, and is referred for a 240 removal proceeding, a regular removal proceeding, is subject to contiguous territory return. But there's nothing in B-1 that allows that specifically. Now, as a matter of procedure, it seems as if the government is switching from B-1 up to the point that there's a credible fear demonstrated, and then they're placed in B-2, because otherwise there's no basis for qualifying for the full panoply of removal. Well, you're right, Judge O'Scanlan, that, you know, that the contiguous territory return provision only applies to people in 240 removal proceedings. So unless — if somebody's been put in expedited removal and they're removed, they're never in a 240 proceeding. If they're — if they ask for a credible fear and they're placed into 240 removal proceedings, under the government's view, they're now subject to contiguous territory return. Now, let me help, if I can. And I want the government to listen to this, because this, in a way, is a question for the government. There are two ways, as I read the statute, to get into 240 or 1229A regular removal proceedings. Right. One, you can be a B-1, you come in with false documents or no documents, you pass the credible fear interview so you're not subject to expedited removal, and you get sent to 240 removal proceedings. Right. Or you're a B-2, that is to say you are another — an other alien, as B-2 says, and that says directly you go to 240 proceedings. As I understand the government, they say, well, if you're in 240 proceedings, whether you came by either route, you are now subject to the C removal or — Return. Return provision. But the flaw to me is that that — well, they might have come to the same place. That is to say, they might have come to 240 removal proceedings, but they've come by different routes. The B-1 comes by one route, the B-2 comes by another route, and by virtue of being in the proceeding, doesn't change their underlying characteristics. So that, if we want a homely example, we've got dogs and cats that go to the pound. Well, just because they're both in the pound, that doesn't turn a dog into a cat or vice versa. And the government can respond to that. But that's a fundamental difference with how I view the case. I agree, Your Honor. And I just want to point out, there's also a third route they can get there, because they could be somebody who could have been put into expedited removal because they were inadmissible on those two grounds, but the government decided to exercise its prosecutorial discretion and put them in regular removal proceedings, which is what's happened to our 11 plaintiffs. That was the first of my grounds. Okay. No, because the first round was actually — they were in expedited rule, they passed credible fear. So I'm saying there's two routes that somebody — That's what you're saying. But what concerns me the most, because, you know, all of this is very technical, I think that our reading of the statute is better both by language and structure, you know, particularly the Jennings-type issues and the titles. But when you think of what the consequences, what the meaning — is this what Congress intended? Under the government's reading, somebody can pass a credible fear screening. And remember, when Congress set up expedited removal, you know, they set up an expedited proceeding because they said people who come without documents or for fraud, they don't — we don't need a whole hearing to determine their inadmissibility. You can determine that pretty quickly, as opposed to people who would — you know, it's drug convictions, terrorism, something else where you're going to need to actually have a hearing to determine if they're inadmissible. But they also recognized the point that you made, Judge Fletcher, which is that a lot of the people who arrive without documents are asylum seekers who are fleeing for their lives. That's why they don't have documents. And that's why Congress went out of its way, as part of the expedited removal system, to create a credible fear screening and a low-credible fear screening, a low-threshold credible fear screening that would ensure that people were not going to be erroneously returned to danger. Now, under the government's reading of this statute, Congress cared about this, and they created this credible fear screening. Now someone passes it, and they can be returned to dangerous conditions in Mexico without any comparable screening, without even, as you said, without even asking them if they're afraid. That's not the government's position, though, because the MPP does not apply. The MPP does not apply. I know. And I'm suggesting that the reason the government was smart to do that is because it could not have applied the MPP, it could not have applied the return provision to someone who was initially placed in expedited removal proceedings and then is transferred  Well, that's interesting, Your Honor. I guess I agree the MPP doesn't apply, but I'm looking just at the statute, and based on their construction of the statute, because I'm looking at what Congress had in mind, based on their construction of the statute, I think, and you can get them to clarify this, those individuals would be subject to contiguous territory return. Now, maybe there would be some other constraint. I think that it all comes down, as you said, to the reading of that 2B, the little 2, to whom paragraph 1 applies. And it just determines on what does applies mean in that context. They're saying that applies means that a determination has been made on the front end to place someone in expedited removal proceedings. And it's only at that point that someone then is that paragraph 1 applies to them. And so once that happens, they're not going to be covered by C, right? Actually, I would like you to ask the government this, you know, because my understanding is that their new interpretation does not hinge on that, because it still says those people have nothing to do with described in paragraph A. Described in paragraph A, they say the salient features have nothing to do with what's in 235B2B2, whether it's applies means this or that. It only means an alien who's, you know, not clearly, you know, entitled to admission. And if that's the case, then that means the person who's passed the credible fear screening. And just to be fair, you know, when we had this argument in district court, the government, you know, said, yes, we're not applying it to those people, but they were reluctant to say that the statute wouldn't allow for it. And I think that under their current interpretation, it seems pretty clear that the statute would allow for it. And all that I'm saying is if we're trying to come up with what's a more reasonable interpretation of the statute, I think you look at that, and it seems more reasonable that Congress wouldn't have wanted a group of people who they were so concerned with having, you know, a rigorous, credible fear screening to then be able to be returned without anything. And I do think it's important to hear, you know, I mean, what they say about that. Because the other thing to realize when you think about this is that people in the – especially when Congress first enacted expedited removal, the main population that it was concerned about were Mexicans. That was the group of people that were – and they were the people that were initially, you know, expedited removal was applied to. And so when they were carving out exceptions for credible fear, you know, there was the real – they had to consider that you could have Mexicans who would have a credible fear and would be applying for asylum. What does it mean to have a Mexican asylum seeker who's passed a credible fear and can now be returned to Mexico? I guess what I'm saying is that I think that if you want to make sense – and the government says that our reading of the statute doesn't make sense – if you want to make sense of why Congress decided that people who were subject to expedited removal, the people who come without documents or fraud, should not be subject to contiguous territory return, it's because it was essentially looking at them the way that Judge Fletcher said, as asylum seekers. And it was saying, we want to be protective of these asylum seekers. And so we're creating a credible fear screening for them. And at the same time, we're not going to allow them to be returned someplace without protections. But the contiguous territory provision would not apply to Mexican applicants. It only applies to people who are not Mexicans. Isn't that true? The NPP is only being applied to people who aren't from Mexico. But the contiguous territory provision does not – not apply to Mexicans. So I think that those are my – the main things I want to say about why this statute makes sense. I think the notion that, oh, somehow or other, why would you treat people who arrive without documents better than others, that's like a false question. You're treating them differently because there – many of them are asylum seekers, and Congress wanted to be careful to not return them to danger. And that's inconsistent with then saying, oh, but they can be just returned with no protection at all. And that moves me into the second question about the adequacy of the procedures. And I appreciate the – your question, Judge Watford, about how – what can it mean? How could you hope to comply with the non-refoulement obligation and not ask somebody whether they're afraid? I mean, it just – it doesn't make sense. All that I'll say is that I think that the government was now jumping at the possibility, well, maybe just say we can do that and it'll all be all right. And unfortunately, I don't think it's that simple because there's other problems with this procedure, and one of them is that it imposes the ultimate standard that one would have to meet in a full-blown regular removal proceeding in order to obtain withholding of removal. It imposes that standard on somebody who's part of just this expedited, on-the-spot interview. So the only place that the agency, that the government has imposed that standard on somebody who's trying to, you know, say, don't return me, is when they get a full removal hearing, where they have, you know, an adversarial hearing before a judge, they have the right to counsel, they have the right to develop evidence, they have the right for an administrative appeal. What we have here is an expedited proceeding. You know, it's – you basically just have to go straight to an – if you're lucky enough, you get referred for an interview, and then on the spot, it's just an interview with an asylum officer, not allowed to consult with counsel. It specifically says that. No time. No time to consult with counsel. No guarantee even of an interpreter. No review of the asylum officer's determination by an immigration judge. In all these respects, it's even less protective than what we have under expedited removal. So – and this was something that Judge Seabrook noted in his opinion. At a minimum, you would think that here are people who were, you know, under the expedited removal. They get a credible fear. It's not a standard. It's a much reduced standard, not the ultimate standard. They get more protections. What has the government done in trying to meet its non-refoulement obligation here? They've taken the highest standard and mixed it with no procedures and said that somebody – that this is going to protect against non-refoulement. It's crazy. It's crazy. And it's – and I'm glad to hear that some people have passed it because the stories that we hear is that very few people are passing it. I mean, very few people are being referred for interviews to begin with, and then very few people are passing it. What if – if I could just ask one question about – As long as you want. If we were only to agree with you on the point relating to procedures, what happens in the rule on whether the stay – a stay should remain in place? Well, that's really your decision. I think that, you know, the injunction holds up on any of these grounds. So, you know, it's – basically, this violates – I mean, if we just did the procedural claim, it violates the APA. Usually the – you know, I believe the remedy for that is vacature, and they can go back and come up with something else. Now, it's true that the injunction also says that it violates the statute. So I suppose you could – you know, if you wanted to parse that, if you were to come to a conclusion – we think it's wrong, but if you were to come to a conclusion that you don't know that we're likely to succeed on the statute, you could say that the – you might be able to say we're going to waive that part of the, you know, injunction or not stay – we're going to stay that part of the injunction or the part of the injunction. I mean, I don't know if you can do this or not. You're the judges. You can figure out what you can do. But I suppose that you could stay part of it and not stay the other. Still, what it means is – and this is really important – it means that they can't follow this until they come up with a procedure that works. And by works, I mean a procedure that is not arbitrary and capricious and that is reasonably related to the goal that they're trying to – that they say that they're committed to, which is protecting people against non-refoulement. I realize – Counsel, are we in a position where we could decide the ultimate merits in this case? In other words, to consider this an appeal on the merits and then decide the case on the merits? I don't think so. I don't think we've had full briefing on the merits. So I think that this is just a stay. Well, subject to additional briefing. Right, but I think there's still the question. I mean, it's already on an expedited briefing track, and I think that's one of the things that, you know, in terms of the irreparable injury thing, you know, I don't know if you want me to address irreparable injury or not, but I feel like, you know, we're talking about an expedited briefing. You know, the government obviously points to a crisis, but I don't think that, you know, as this court said in East Bay, the fact that there's a crisis isn't enough to say that they're going to be suffering irreparable injury. And especially if you balance it against what the district court found, which is that there's no dispute that the individual plaintiffs here, the plaintiff organizations, and many, many more individuals who've been removed and have been returned are suffering concrete irreparable injury in terms of threats of kidnappings, death threats, sexual assaults, you know, a whole range of things that the district court and that's in the record. So... Okay. Any further questions from the bench? Thank you very much. Now, Mr. Stewart, you sought to preserve three minutes. Why don't we put three minutes on the clock for rebuttal? Thank you, Your Honor. I want to make sure to hit just two or three points, Your Honor. The first is, respectfully for my friend, she still has not given an account for how DHS can put an arriving alien directly into Section 240 proceedings. The only authority for that that they have acknowledged or identified that the district court could have addressed was B2A. That's the authority to do it. Somebody might end up in a full removal proceeding later by some other route, but that still doesn't address that immediate authority and discretion issue of how an alien, like the plaintiffs here, who could potentially be placed in expedited removal proceedings, can nonetheless be placed directly into full removal proceedings. It all comes down to B2A. And once it is established that B2A can be applied to these aliens and is applied to these aliens, the B2C return authority comes into place. And so what is your response to your opponent's query to you? Somebody is placed initially in expedited removal proceedings, expresses a credible fear, is then placed in regular removal proceedings. Can they be subjected to the subsection C return authority? I think that was the — I'd leave open the possibility, Your Honor. It's, again, it's still not presented here. What I would point to, Your Honor, is that somebody is not by the statute necessarily entitled even to be placed in that kind of proceeding. It's under 1225 — I want to make sure to get the subdivision right — 1225 B2B Romanet 2. It says that an alien that passes credible fear shall be detained for further consideration of the application for asylum. Not necessarily a full removal proceeding, but basically what that says is down the line, after this initial kind of B1, B2A kind of choice is made, somebody can get into that further consideration. By regulation, that person does go into Section 240 proceedings. But, again, that still doesn't get to the difficulty for my friend, which is that initial how does somebody get placed in 240 proceedings. As I understand your argument, it is dependent upon your first argument in your papers filed with us, not the reply, but the first papers filed with us, your first argument, which is to say that B1 describes a certain category of arriving applicants. B2 describes not only B1, but also all the others, and that, therefore, they're not two discrete and separate categories. If that's true, I see how your argument goes from there. If it's not true, as I see it, your argument falls apart and doesn't work. Am I right that it falls apart if B1 and B2 are in separate and non-overlapping categories? Respectfully, Your Honor, it does not fall apart. And I'd say the described in is kind of a supporting secondary argument. We're really focusing on where does this B2A full removal authority come from. But why doesn't it fall apart? Because if B1 people are only B1 people and can never be anything other than B1 people, B2 people are subject to the return provision, but B1 are not. So how do you get there? The only way you get there, as I read your argument, and this is what you wrote, is that B1 people are also at the same time B2 people and, therefore, subject to the procedures of B2, including B2Bii, which then allows, in your view, to take them out of B2 and back into B1. That's the argument you made on your papers. Not quite, Your Honor. I'd refer to, I think, Judge Watford gave a good description of it, Your Honor, where the question is, you have this alien, and they could potentially be put into either category, fit the description of either category. The question is which provision is applied to them. That then determines what happens next. But wait a minute. I understand that somebody needs to make a determination, and I'll use a homely example. I need to make a determination whether this is a dog or a cat. But the person or the entity or the animal is a B1 or a B2 or the animal is a dog or a cat, irrespective, before I make the determination and after I make the determination, my determination is merely sorting them into the categories described in B1 or described in B2. They don't become one or the other based on my determination. They either are arriving without documents or with fraudulent documents, or they're  And my saying one way or the other doesn't change how they're arriving. And I would suggest, Your Honor, what I would say is that we don't have an immutable dog-cat situation here. We have folks who could be But no, but as I read the statute, that's exactly what we do have, because B1 says arriving aliens who are inadmissible by virtue of, and then I specify two statutory sections, that's what they are. They either are arriving under those circumstances or they are not. And then B2 says, here are the others. Those are the, that's what they are, and they're not mutable, they are immutable. That's how they're showing up. And I would say, in addition to the responses I've given, Your Honor, the problem with that is it's still a problem for my friends, because basically what it's saying is that even if somebody's a cat, we're going to somehow turn them into a dog. And I think that's where the analogy has a problem, and I would just emphasize, Your B2A, things follow from there. Thank you for the extra time, Your Honor, and we appreciate the opportunity to present this argument. Thank both sides for your very helpful arguments. The case is now submitted.
judges: O'scannlain, W. Fletcher, Watford